**STEVE SILVEUS INSURANCE, INC., and Silveus Insurance Group, Inc., Appellants–Plaintiffs,**

v.

**Richard L. GOSHERT, Goshert Crop Insurance, Inc., Richard D. Goshert, Goshert Enterprises, Inc., David Goshert, Goshert Farms, Inc., Goshert Insurance, LLC, Richard Leroy Goshert, Inc., Rick Goshert Insurance, Inc., DLG Enterprises, Inc., Riedel ABC Corporation, and XYZ Corporation, Appellees–Defendants.**

No. 34A03–0603–CV–88.

Court of Appeals of Indiana.

Sept. 12, 2007.

---

Paul D. Refior, Refior Law Office, Warsaw, IN, Attorney for Appellants.

Michael H. Michmerhuizen, Cathleen M. Shrader, Thomas A. Herr, Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

The events giving rise to this appeal began in 1994, when Steve Silveus hired former business associate and longtime friend Richard L. Goshert ("Richard Goshert") to sell crop insurance on behalf of the Steve Silveus Insurance Agency. The agreement between the parties included a provision requiring thirty days' notice of termination and a covenant by Richard

Goshert not to compete with Silveus. Silveus subsequently signed identical agreements with Richard Goshert's sons, David Goshert and Richard D. Goshert ("Rick Goshert"). When Steve Silveus believed that the Gosherts had begun competing with him and his agency, he terminated the agreements without providing the Gosherts with thirty days' notice. When the Gosherts separated from Silveus, Rick Goshert took back-up tapes containing certain trade secrets belonging to Silveus, and the Gosherts formed Goshert Insurance, LLC to compete with Silveus.

These actions prompted Steve Silveus Insurance, Inc. and Silveus Insurance Group, Inc. (collectively "Silveus") to file a lawsuit against the Gosherts alleging breach of contract, conversion, and misappropriation of trade secrets and asking for injunctive and declaratory relief and monetary damages.[1] The Gosherts filed a counterclaim against Silveus, alleging breach of contract, unfair competition, defamation, fraud, and conversion. The trial court concluded that Silveus was the first party to breach the agreements due to its failure to provide the Gosherts with thirty days' notice of termination. As such, the trial court awarded the Gosherts $512,170.91 on their breach of contract claim and rejected Silveus' breach of contract claim based on the covenants not to compete, concluding that the first party to materially breach a contract is precluded from enforcing such covenants. However, the trial court ruled in favor of Silveus on its claim for misappropriation of trade secrets and awarded it equal damages of $512,170.91, thereby offsetting the Gosherts' damage award.

Silveus appeals the trial court's judgment and damages award as to the parties' breach of contract claims. Silveus also appeals the trial court's refusal to award it attorney fees on its conversion claim against the Gosherts, contending that it prevailed on that claim. The Gosherts cross-appeal the trial court's judgment in favor of Silveus on Silveus' claim for misappropriation of trade secrets. We affirm the judgment of the trial court in all respects.

**Facts and Procedural History**

The Silveus family has been selling crop insurance in northern Indiana since the 1940s. For approximately the last forty years, Steve Silveus has been at the helm of that business. The business comprises several distinct entities, including the named plaintiffs in this case, Steve Silveus Insurance, Inc. and Silveus Insurance Group, Inc. Steve Silveus is a longtime acquaintance of Richard Goshert. The two were business partners in the 1970s and, until this dispute arose, personal friends.

In 1994, Richard Goshert began selling crop insurance for Silveus pursuant to an agreement with Steve Silveus Insurance Agency, Inc. In 1998, Richard Goshert signed an identical agreement with Steve Silveus Insurance Agency, Inc. in his capacity as president of Goshert Crop Insurance, Inc. That same year, David Goshert, one of Richard Goshert's sons, began selling crop insurance for Silveus pursuant to an identical agreement, which David Goshert signed in his capacity as president of Goshert Farms, Inc. Then, in 2000, Rick Goshert, also the son of Richard Goshert,

---

1. The defendants in the lawsuit filed by Silveus were Richard L. Goshert, Goshert Crop Insurance, Inc., Richard D. Goshert, Goshert Enterprises, Inc., David Goshert, Goshert Farms, Inc., Goshert Insurance, LLC, Richard E. Riedel, Riedel, Inc., Richard Leroy Goshert, Inc., Rick Goshert Insurance, Inc., DLG

Enterprises, Inc., Riedel ABC Corporation, and XYZ Corporation. *See* Appellants' App. p. 27A–79. The trial court eventually dismissed Richard E. Riedel and Riedel, Inc. as defendants, and they are not parties to this appeal. We refer to the defendants collectively as "the Gosherts" throughout this opinion.

began selling crop insurance for Silveus pursuant to an identical agreement, which Rick signed in his capacity as president of Goshert Enterprises, Inc. Each of the agreements was entitled "Independent Contractor Engagement Agreement." Because they are all essentially identical, we will refer to them collectively as "the Agreements." Silveus' attorney drafted the Agreements, each of which contained a confidentiality agreement.

Paragraph 2 of the Agreements provides, "The term of this Agreement shall be from_____,[2] and shall continue until the expiration of thirty (30) days after either party shall give thirty (30) days written notice of termination." *See, e.g.,* Appellants' App. p. 28; *see also id.* at 34, 40, 46. Furthermore, Paragraphs 4, 16, 17, 18, and 19 comprise a covenant not to compete with Silveus in the crop insurance business during the term of the agreement or for three years after the termination of the agreement in numerous counties in Indiana, Michigan, Ohio, and Illinois.

In addition to becoming a salesman for Silveus, Rick Goshert was also hired to act as Silveus' IT manager. In this role, Rick Goshert had a great deal of control over Silveus' computer-related issues. Silveus maintained computer databases that contained certain customer information, including client names, names of prospective clients, property descriptions, farm names, property identifications maintained by the United States Department of Agriculture, past insurance coverages, and histories of losses. Importantly, Rick Goshert had access to Silveus' computer back-up tapes, which contained much of this customer information. As Silveus' IT manager, Rick Goshert also worked with other Silveus salesmen to develop computer programs and software related to the crop insurance

business. The software Silveus salesmen used included programs such as GRP, GRIP, MPCI, CropCalc, Swanware, and What If.

In 2001, certain Silveus salesman, including the Gosherts, expressed unhappiness with the prominence of Steve Silveus' name on Silveus sales materials. As such, Steve Silveus changed the name of Steve Silveus Insurance Agency, Inc. to Silveus Insurance Group, Inc. Steve Silveus determined that this change required new independent contractor engagement agreements. Specifically, Steve Silveus concluded that each salesman would be required to execute an agreement in his individual capacity in addition to the agreements executed by the corporate entities that had previously entered agreements with Silveus, *i.e.,* Goshert Crop Insurance, Inc., Goshert Farms, Inc., and Goshert Enterprises, Inc. The individual Gosherts refused to sign agreements in their personal capacities due to the increased liabilities associated with such a change.

The relationship between the Gosherts and Silveus continued to deteriorate during 2001. In December 2001, Rick Goshert sent Silveus a letter resigning his position as Silveus' IT manager, though he remained as a salesman. Then, on January 7, 2002, the Gosherts met with Silveus to discuss the future of the relationship between the two. The possibility of new agreements signed by the individual Gosherts was raised again, and the Gosherts again refused to sign such agreements. On January 9, 2002, Silveus discovered that Rick Goshert had taken steps to preclude Silveus agents other than the Gosherts from accessing certain programs on their computers. That day, the Silveus family met and determined that it would

---

**2.** Each individual agreement had a different start date.

be best for Steve Silveus to terminate the Gosherts. Silveus terminated the Gosherts two days later, on January 11, 2002, with more than two months remaining in the federally-restricted crop insurance selling season, which did not end until March 15, 2002.

As of January 9, 2002, two days before their termination, the Gosherts had already drafted a letter to be sent to Silveus customers and prospects in an attempt to attract those farmers to a new agency, Goshert Insurance, LLC. The draft provided, in pertinent part:

> The agency I have been associated with to service your crop insurance needs in the past, Steve Silveus Insurance Agency, Inc. is being restructured. Because of these changes, I feel your needs will be better served by forming (joining) Goshert Insurance, LLC (?). We will still be located in Warsaw, Indiana and ? ? ? ? ? ? ?.

*Id.* at 66. Furthermore, Rick Goshert monitored Silveus' e-mail communications between January 9 and January 11, 2002. After being terminated by Silveus, the Gosherts formally created Goshert Insurance, LLC and began sending solicitation letters to Silveus customers and prospects within the geographical areas restricted in the covenants not to compete.

Silveus filed a Complaint for Damages and Injunctions ("Complaint") against the Gosherts,[3] alleging breach of contract, conversion, and misappropriation of trade secrets under Indiana Code chapter 24–2–3. Silveus requested injunctive and declaratory relief and monetary damages. Silveus claimed, in part, that the Gosherts had violated the covenants not to compete in the Agreements. The Gosherts filed a counterclaim ("Counterclaim"), alleging breach of contract, unfair competition, defamation, fraud, and conversion. The Gosherts claimed, in part, that Silveus had breached the Agreements by failing to provide thirty days' notice of termination in accordance with Paragraph 2.

The trial court conducted a twelve-day bench trial between October 11, 2004, and September 28, 2005. Regarding the consequences of Silveus' failure to provide the Gosherts with thirty days' notice of termination, Richard Goshert testified, "I could have at least serviced all clients that I already had, if not been able to see some new ones." Tr. p. 1021. When asked whether he would have been able to renew all of his existing business within thirty days, he responded that "the renewing process did not consume 30 days of the sale season, so, yes. I could have done that." *Id.* Furthermore, when Rick Goshert was asked whether he would have been able to renew most or all of his policies if he had been given thirty days' notice, he stated:

> Yes. Actually all Federal crop insurance policies automatically renew without doing anything. So, that's a given. In that 30 days you could have, aside from the automatic renewals, seen all of those people or at least contacted them to see if they wanted any changes and sold new business as well.

*Id.* at 1454.[4]

As to Silveus' claims for conversion and misappropriation of trade secrets, Rick Goshert testified that Silveus had only ten

---

3. For a complete listing of the defendants, *see supra* note 1.

4. The transcript actually indicates that Rick Goshert was asked whether he could have "reviewed" his policies if he had been given thirty days' notice. Tr. p. 1453. Nonetheless, because he phrased his answer in terms of "renewals," we assume that there was a transcription error and that he was actually asked whether he could have "renewed" those policies.

computer back-up tapes and that he did not take any of them after his termination. *See* Tr. p. 1455. However, Michael Cocks, Silveus' new IT manager, testified that two additional tapes existed and that they were no longer in Silveus' possession. *See id.* at 505, 507, 509. Cocks also testified that before he was put in charge of the back-up tapes in his role as Silveus' IT manager, Rick Goshert was responsible for the tapes. *See id.* at 503. As to the location of the alleged additional tapes, Cocks testified, "The other two tapes to my knowledge we don't have those. They're not in our possession. Where they're located would be speculation but I believe I understand where they're at." *Id.* at 509.

As further support for its claim that the Gosherts misappropriated its trade secrets, Silveus introduced into evidence a collection of Goshert Insurance, LLC documents for farmer Douglas Johnson and a collection of Silveus documents for Johnson. *See* Appellants' App. p. 85–93 (Ex. 25), 94–96 (Ex. 26). The exact same land descriptions, including FSA numbers and farm names, are included in both sets of documents, and they appear in the exact same order. *Compare id.* at 88 *with id.* at 94–95. Likewise, the results of the Gosherts' "GRIPAY Option Analyzer" and Silveus' "GRIPAY Loss Pay Calculator" for Elkhart County are identical, as are the layouts of the documents. *Compare id.* at 271 (Ex. 173) *with id.* at 273 (Ex. 175).

Following the presentation of evidence, the trial court concluded that the Gosherts were entitled to thirty days' notice of termination under Paragraph 2 and that Silveus had materially breached the Agreements by failing to provide such notice. Based on this breach, the trial court awarded the Gosherts damages of $512,170.91. The trial court also rejected Silveus' claim regarding the Gosherts' alleged breach of the covenants not to compete, concluding that Silveus, as the first party to materially breach the Agreements, was precluded from subsequently enforcing the covenants not to compete. However, the trial court entered judgment in favor of Silveus on its claim for misappropriation of trade secrets and awarded it identical damages of $512,170.91, thereby offsetting the Gosherts' damage award. The trial court also ordered each party to pay its own attorney fees. Silveus now appeals, and the Gosherts cross-appeal.

## Discussion and Decision

 This appeal presents several different issues calling for several different standards of review, which we will address as necessary. Generally, however, when the trial court enters findings of fact and conclusions of law, its findings and conclusions shall not be set aside unless clearly erroneous. *Shady v. Shady*, 858 N.E.2d 128, 140 (Ind.Ct.App.2006), *trans. denied.* A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. *Id.* We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. *Id.* We consider only the evidence favorable to the judgment and all reasonable inferences to be drawn from that evidence. *Id.* We neither reweigh the evidence nor assess witness credibility. *Id.*

On appeal, Silveus raises five issues, which we restate as: (1) whether the trial court erred in concluding that the Gosherts were entitled to thirty days' notice of termination; (2) whether the trial court's conclusion that Silveus' breach of the Agreements was material is clearly erroneous; (3) whether the trial court erred in concluding that Silveus is precluded from enforcing the covenants not to compete contained in the Agreements because it was the first party to materially breach

the Agreements; (4) whether the trial court abused its discretion in its award of damages; and (5) whether the trial court erred in refusing to award Silveus attorney fees on its conversion claim. The Gosherts cross-appeal the trial court's judgment in favor of Silveus on Silveus' claim for misappropriation of trade secrets, arguing that the trial court erred in concluding that trade secrets existed and that even if trade secrets did exist, the trial court's conclusion that the Gosherts misappropriated them is clearly erroneous. Before turning to our review of the trial court's judgment, we pause to make some observations regarding appellate practice.

## I. The Appellate Rules and Attorney Decorum

We ask for two basic things from appellate practitioners in this state: compliance with the Indiana Rules of Appellate Procedure and adherence to fundamental standards of professionalism.

In this regard, we initially note that Silveus' counsel failed to comply with at least two rules of appellate procedure. First, he included the entire 1515–page transcript in the Appellants' Appendix. Aside from being a waste of paper and unnecessarily bloating the record on appeal, this practice violates Indiana Rule of Appellate Procedure 50(A)(2). Subsection (d) compels the inclusion of *"the portion* of the Transcript that contains the rationale of decision and any colloquy related thereto, if and to the extent the brief challenges any oral ruling or statement of decision," while subsection (g) allows a party to include any *"brief portions* of the Transcript . . . that are important to a consideration of the issues raised on appeal[.]" (Emphases added); *see also Burge v. Teter,* 808 N.E.2d 124, 127 n. 3 (Ind.Ct.App.2004) ("Indiana Appellate Rule 50(A)(2)(d) and (g) clearly state that only certain *portions* of the transcript should be included in the

appendix."). For purposes of this opinion, any references to the transcript will be to the actual transcript and not to the copy in the Appellants' Appendix.

Second, Silveus' counsel failed to comply with Indiana Rule of Appellate Procedure 51(C), which provides, "All pages of the Appendix shall be numbered at the bottom consecutively, without obscuring the Transcript page numbers, regardless of the number of volumes the Appendix requires." In an "attempt to make it easier to locate and identify items" in the appendix, Appellants' App. p. 1, Silveus' counsel devised a numbering system that accounts for his inclusion of the entire 1515–page trial transcript in the appendix. But instead of making things easier for us, he has made matters unnecessarily confusing. Appellants' Appendix is numbered from page 1 through page 27, then from page 1 (of the transcript) through page 1515 (of the transcript), then from page "27A–1" through page "27A–92," and finally from page 28 through page 970. As a result, there are, for example, two pages marked "45," two pages marked "139," two pages marked "802," etc. If counsel had simply assembled his 2587–page appendix in accordance with Rule 51(C), it would have been numbered consecutively from page 1 through page 2587.

Perhaps more bothersome than Silveus' counsel's noncompliance with the appellate rules is the tenor of his briefs. At one point he writes, "To summarize, Richard Goshert, David Goshert, and Rick Goshert are thieves and liars." Appellants' Br. p. 45. Later, he writes, "The same lack of conscience, arrogance, and ingratitude that led to Goshert stealing Silveus' trade secrets and business, underlies Goshert's warped view that Silveus did not own anything and did not have any secrets so Goshert should be free to rip them all off for themselves." Appellants' Reply Br. p.

9; *see also id.* at 11 (characterizing opposing counsel's argument as "an insult to the English language"). As we have recently stated, "Such vitriol is inappropriate and not appreciated by this court, nor does it constitute effective appellate advocacy." *Hoosier Outdoor Adver. Corp. v. RBL Mgmt., Inc.,* 844 N.E.2d 157, 162 (Ind.Ct. App.2006), *trans. denied.*

We also note that the Gosherts' attorneys have not completely fulfilled their duty of candor to this Court. In their Appellees' Brief, the Gosherts' attorneys make mention of "the federally mandated 75-day crop insurance season." Appellees' Br. p. 26. In support of this assertion, they direct us to testimony of Richard Goshert to the effect that "the farmers will not entertain anything about crop insurance for new year until after January 1" and that "March 15 was the sales closing date for all spring planted crops" under federal law. Tr. p. 1021–1022. However, he also testified that "from a legal standpoint, the season starts clear back in July or August of the year before." *Id.* at 1021. Richard Goshert's testimony plainly does not support the existence of a "federally mandated 75-day crop insurance season."

## II. 30–Day Notice

Turning now to the merits of this appeal, Silveus first argues that the trial court erred in concluding that the Agreements required Silveus to give the Gosherts thirty days' notice prior to termination. The construction of the terms of a written contract presents a pure issue of law, which we review *de novo. Trinity Homes, LLC v. Fang,* 848 N.E.2d 1065, 1068 (Ind.2006).

The trial court based its conclusion on Paragraph 2 of the Agreements, which provides, "The term of this Agreement shall be from _____,[5] and shall continue until the expiration of thirty (30) days after either party shall give thirty (30) days written notice of termination." *See, e.g.,* Appellants' App. p. 28; *see also id.* at 34, 40, 46. On appeal, Silveus contends that the trial court erred in applying Paragraph 2 to the Gosherts. Silveus argues that the Gosherts' termination was instead strictly governed by subsection (b) of Paragraph 15 of the Agreements. Paragraph 15 is titled "Termination of Agreement," and subsection (b) pertains to the termination of vested salesmen, including the Gosherts.[6] Subsection (b) provides, in pertinent part:

> If Salesman has obtained a vested interest in the insurance business written by Salesman pursuant to the provisions of paragraph 13 of this Agreement (procuring $200,000 or more in annual insurance premium sales), then Salesman shall be entitled to receive commissions on all premiums on insurance business written by Salesman, accrued and payable prior to the effective date of termination. Furthermore, Agency shall compensate Salesman for his vested interest in such insurance business in an amount of 1½ times Salesman's share of crop hail insurance commissions for such insurance business which (1) existed during the year of termination, AND (2) which insurance business is renewed for the year following the year of termination, *AND* (3) Agency is fully paid for such insurance for the year following the year of termination; plus an amount of 1 times

Salesman totals $200,000.00 or more[.]". *See, e.g.,* Appellants' App. p. 30; *see also id.* at 36, 42, 47–48. It is undisputed that the Gosherts were vested salesmen at all times relevant to this opinion.

---

5. *See supra* note 2.

6. Paragraph 13 of the Agreements explains that a salesman earns a vested interest in the business he or she produces when "the annual insurance premium sales procured by

Salesman's share of multi-peril crop insurance commissions for such insurance business which (1) existed during the year of termination, *AND* (2) which insurance business is renewed for the year following the year of termination, *AND* (3) Agency is fully paid for such insurance for the year following the year of termination.

\* \* \* \* \* \*

*Each of the non-competition covenants specified in paragraphs 16, 17, 18 and 19 of this Agreement shall be in full force and effect for a period of three (3) years following the date of such termination.*

*See, e.g., id.* at 31; *see also id.* at 37, 43, 48–49. As can be seen, Paragraph 15(b) contains no specific notice requirement.

Silveus notes that "when a contract contains general and specific provisions relating to the same subject, the specific provision controls." Appellants' Br. p. 23 (citing *Magee v. Garry–Magee*, 833 N.E.2d 1083, 1092 (Ind.Ct.App.2005)). Silveus asserts that the Agreements contain both a general provision—Paragraph 2—and a specific provision—Paragraph 15(b)—relating to the same subject—termination—and, therefore, the specific provision controls. And since the specific provision—Paragraph 15(b)—contains no notice requirement, Silveus maintains that the trial court erred in applying a thirty-day notice requirement to the Gosherts. We disagree.

■ First, we do not agree that Paragraph 2 and Paragraph 15(b) relate to the same subject. To be sure, both provisions deal in some way with termination. But beyond that similarity, Paragraph 2 concerns the term of the Agreements and the requirement of notice of termination, while Paragraph 15(b) concerns the financial consequences of termination of a vested salesman. Stated differently, while Paragraph 15(b) is more specific than Paragraph 2 as to the termination of vested salesmen, Paragraph 2 is more specific than Paragraph 15(b) as to notice of termination.

■■ Second, to adopt Silveus' interpretation of the Agreements would be to render Paragraph 2 completely meaningless insofar as vested salesmen are concerned. In construing a contract, we presume that all provisions included in a contract are there for a purpose and, if possible, reconcile seemingly conflicting provisions to give effect to all provisions. *City of Lawrenceburg v. Milestone Contractors, L.P.,* 809 N.E.2d 879, 883 (Ind. Ct.App.2004), *trans. denied.* That is, construction of contract language that would render any words, phrases, or terms ineffective or meaningless should be avoided. *Id.* Under Silveus' interpretation of the Agreements, Paragraph 2 would be rendered meaningless with regard to vested salesmen.

In further support of its argument that the thirty-day notice requirement does not apply to the termination of vested salesmen, Silveus relies upon another canon of construction: *expressio unius est exclusive alterius,* or, to express or include one thing implies the exclusion of the other. Black's Law Dictionary 620 (8th ed.2004). Silveus' argument goes as follows: subsection (a) of Paragraph 15, dealing with the termination of *non-vested* salesmen, repeats the thirty-day notice requirement of Paragraph 2, *see, e.g.,* Appellants' App. p. 30 ("[E]ither party shall give the other party a thirty (30) day written notice of termination, and this Agreement, and the relationship between Salesman and Agency shall automatically end upon the expiration of thirty (30) days after either party gives such thirty (30) days written notice of termination."), but subsection (b) of

Paragraph 15, dealing with the termination of vested salesmen, does not; the inclusion of the notice requirement in subsection (a) implies the exclusion of the requirement in subsection (b). Again, we cannot agree with Silveus. The trial court found that the notice provision of Paragraph 15(a) is merely "duplicitous" of Paragraph 2. *See id.* at 19 (Finding of Fact 12). We believe this to be the much more reasonable interpretation of the Agreements. And again, any other interpretation would render Paragraph 2 completely meaningless with regard to vested salesmen.

■ Three other considerations weigh in favor of the Gosherts on the issue of notice. First, to the extent that there is an ambiguity as to whether the Gosherts, as vested salesmen, were entitled to thirty days' notice, we resolve an ambiguity in a contract against the drafter, here, Silveus. *See MPACT Const. Group, LLC v. Superior Concrete Constructors, Inc.,* 802 N.E.2d 901, 910 (Ind.2004). Second, while Paragraph 15(b) makes no express reference to notice, it does refer to "the effective date of termination." *See, e.g.,* Appellants' App. p. 31. We are persuaded by the Gosherts' argument that the inclusion of the phrase "effective date" suggests a distinction between that date and the "notice date." Third, if we adopt Silveus' interpretation of the Agreements, subsection (c) of Paragraph 15, which concerns the return of property by terminated salesmen to Silveus, would not apply to vested salesmen. Subsection (c) provides, in pertinent part: "*In the event either party gives notice to terminate this Agreement,* Salesman shall promptly return to Agency all documents, records, notebooks, expiration records, policyholder lists, computers, computer records, software, and computer programs, then in Salesman's possession, and Salesman shall not keep any copy, duplicate or electronic copy thereof." *Id.* (emphasis

added). The Gosherts correctly observe that the obligation to return property to Silveus is triggered only by the giving of notice. If vested salesmen are not entitled to notice prior to termination, then they would be exempt from the return-of-property requirement, an absurd result that we will not endorse.

For these reasons, the trial court did not err in concluding that the Gosherts were entitled to thirty days' notice of termination.

### III. Materiality of Silveus' Breach

■ Silveus also maintains that even if the trial court correctly determined that the Gosherts were entitled to thirty days' notice of termination and that Silveus breached the Agreements by failing to give such notice, it erred in concluding that the breach was material. A material breach is one that goes to the heart of the contract, and whether a breach is material is generally a question of fact to be decided by the trier of fact. *Goff v. Graham,* 159 Ind. App. 324, 306 N.E.2d 758, 765 (1974). We note that while Silveus filed the initial Complaint here, the Gosherts filed a Counterclaim for breach of contract, and it is from the trial court's judgment on the Gosherts' breach of contract counterclaim that Silveus appeals in this regard. Because Silveus did not bear the burden of proof on this claim at trial, but rather was defending, they appeal from an adverse judgment. *See McCarty v. Walsko,* 857 N.E.2d 439, 443 (Ind.Ct.App.2006). "When the trial court enters findings in favor of the party bearing the burden of proof, the findings are clearly erroneous if they are *not* supported by substantial evidence of probative value." *Id.* We will reverse an adverse judgment, even where we find substantial supporting evidence, if we are left with a definite and firm conviction a mistake has been made. *Id.*

■ Silveus contends that because the Agreements prohibited the Gosherts from competing with Silveus following termination and Paragraph 15(c) prohibited the Gosherts from engaging in any crop insurance work on behalf of Silveus following notice of termination (by virtue of the return-of-property requirement), "[t]here would have been no practical difference whether a notice was given or not" and the Gosherts "would not have suffered differing damage one way or the other." Appellants' Br. p. 29. In essence, Silveus argues that any breach was not material because the Gosherts would not have been any better off with thirty days' notice than they were without it. But there is evidence to suggest otherwise.

When asked what he could have done during a thirty-day notice period, Richard Goshert testified, "I could have at least serviced all clients that I already had, if not been able to see some new ones." Tr. p. 1021. When asked whether he would have been able to renew all of his existing business within thirty days, he responded that "the renewing process did not consume 30 days of the sale season, so, yes. I could have done that." *Id.* Furthermore, when Rick Goshert was asked whether he would have been able to renew most or all of his policies if he had been given thirty days' notice, he stated:

> Yes. Actually all Federal crop insurance policies automatically renew without doing anything. So, that's a given. In that 30 days you could have, aside from the automatic renewals, seen all of those people or at least contacted them to see if they wanted any changes and sold new business as well.

*Id.* at 1454.[7] The Gosherts are correct that "[t]his evidence is more than sufficient to support the Trial Court's conclusion finding that depriving the Gosherts of their ability to complete their sales for the year by failing to give the notice required in the contract struck at the very core of the parties' Agreement and was therefore material." Appellees' Br. p. 26. Because the trial court's conclusion that Silveus committed a material breach is supported by substantial evidence of probative value, it was not clearly erroneous.[8]

## IV. Enforceability of Covenants Not To Compete

■ Next, Silveus challenges the trial court's Conclusion of Law 7, which provides: "[Silveus] appears to have been the first party to materially breach a term of the agreement, the notice provision, and thus, is precluded from subsequently enforcing the covenants not to compete." Appellants' App. p. 24 (citations omitted). Silveus does not challenge the trial court's legal conclusion that the first party to materially breach an employment agreement cannot subsequently enforce a covenant not to compete in the same agreement. *See Licocci v. Cardinal Assocs., Inc.,* 492 N.E.2d 48, 52–54 (Ind.Ct.App. 1986), *reh'g denied, trans. denied.* Rather, Silveus contests the trial court's factual finding that Silveus was the first party to materially breach the Agreements. Because we are returning to Silveus' own claim for breach of contract, Silveus bore the burden of proof at trial and is therefore appealing from a negative, as opposed to adverse, judgment. *The Blakley Corp. v. EFCO Corp.,* 853 N.E.2d 998, 1002 (Ind.

7. *See supra* note 4.

8. Though we hold in favor of the Gosherts on this issue, we reiterate our concern regarding their attorneys' claim of a "federally mandated 75-day crop insurance season," discussed

in Section I, *supra.* As noted therein, the testimony cited by the Gosherts' attorneys does not support the existence of such a limited sales season. *See* Tr. p. 1021–22.

Ct.App.2006). A party appealing from a negative judgment will prevail only if it establishes that the judgment is contrary to law. *Id.* "A judgment is contrary to law when the evidence is without conflict and all reasonable inferences to be drawn from the evidence lead only to one conclusion, but the trial court reached a different conclusion." *Id.*

■ Silveus contends that the Gosherts committed several different breaches before Silveus terminated the Gosherts on January 11, 2002. First, directing us to several of the trial court's findings of fact and certain trial testimony, Silveus notes:

> On January 9, 2002 (which was prior to January 1[1], 2002) Silveus discovered that Rick Goshert was endeavoring to preclude Silveus agents other than [the Gosherts] from utilizing the Silveus programs on their respective computers (Finding ¶ 31). Rick Goshert was surreptitiously monitoring email communications of Silveus during the period January 9, 2002 through January 11, 2002 (Finding ¶ 33).[9] Weeks before the termination Richard Goshert inquired of Gene Overman, a representative of a crop insurance company, about whether Goshert could enter into an agency agreement separate and apart from Silveus (Tr. 246, 1100–1101).[10] Weeks before the termination Rick Goshert made communications concerning the marketing of Silveus' trade secret software (Tr. 247; Exhibit 300, App. 903–904).[11] At least by January 9, 2002, which was prior to termination, [the Gosherts] had

selected a name for a new competing entity, Goshert Insurance, LLC (Finding ¶ 32).

Appellants' Br. p. 37. After listing these actions, however, Silveus fails to explain how they constitute breaches of the Agreements. At the most, "conversations," "communications," and the selection of a name of a potential future entity amount to planning, and planning, with no further action, does not constitute a breach. *See Potts v. Review Bd. of Ind. Employment Sec. Div.*, 475 N.E.2d 708, 712 (Ind.Ct.App. 1985) ("[A]n employee may even make arrangements to compete, such as investments or the purchase of a rival corporation or equipment, except that he cannot properly use confidential information peculiar to his employer's business, before he leaves his employ."), *reh'g denied, trans. denied.*

Silveus also directs us to what it refers to as a "first-to-breach/smoking gun" letter. Appellants' Br. p. 37. The document is a preliminary draft of a form letter from Goshert Insurance, LLC, apparently meant for distribution to existing and prospective Silveus clients. The letter provides, in pertinent part:

> The agency I have been associated with to service your crop insurance needs in the past, Steve Silveus Insurance Agency, Inc. is being restructured. Because of these changes, I feel your needs will be better served by forming (joining) Goshert Insurance, LLC (?). We will still be located in Warsaw, Indiana and ? ? ? ? ? ? ? ?.

---

9. Though the trial court did find that Rick Goshert monitored Silveus' e-mail communications, it did not find, as Silveus suggests, that he did so "surreptitiously." *See* Appellants' App. p. 22 (Finding of Fact 33).

10. Contrary to Silveus' claim that Richard Goshert's conversation with Gene Overman took place "weeks before the termination,"

Overman testified that the conversation took place in 1999 or 2000. *See* Tr. p. 246–47.

11. Again, there is no indication in the portions of the record cited by Silveus that these communications occurred "weeks before the termination." *See* Tr. p. 247; Appellants' App. p. 903–04.

Appellants' App. p. 66. This letter no doubt contemplates direct competition between the Gosherts and Silveus, in violation of the covenants not to compete in the Agreements. But, again, planning to compete does not equal competition, *see Potts*, 475 N.E.2d at 712, and Silveus concedes in its brief that no letters were actually sent to any Silveus customers until "a few days after termination[.]" Appellants' Br. p. 39. Therefore, any breach by the Gosherts as a result of this letter took place *after* the breach by Silveus.[12]

Finally, Silveus briefly argues that the Gosherts first breached the Agreements because "Rick Goshert stole Silveus' backup tapes that contained Silveus' trade secrets and then shared that information with the other individual Gosherts who utilized the information in direct competition with Silveus[.]" *Id.* at 40. However, this assertion is based on an erroneous finding of fact by the trial court and a fundamental misunderstanding of the timing of Rick Goshert's alleged conversion.[13] The trial court's Finding of Fact 34 provides that Rick Goshert knowingly and intentionally exerted unauthorized control over the trade secrets of Silveus "prior to his termination by Silveus[.]" Appellants'

App. p. 22. But Rick Goshert had lawful access to these tapes and permission to use the tapes while he was still associated with Silveus. Therefore, any breach of the Agreements by the Gosherts took place *after* Silveus terminated the Gosherts, when Rick Goshert retained the tapes and failed to return them. Silveus' contention, and the trial court's finding, that Rick Goshert "stole" Silveus' trade secrets before being terminated are without merit.

## V. Misappropriation of Trade Secrets

The Gosherts cross-appeal the trial court's judgment in favor of Silveus on its claim that the Gosherts misappropriated certain of Silveus' trade secrets.[14] It is now the Gosherts who are appealing from an adverse judgment, as they did not bear the burden of proof on this issue at trial. As such, we will reverse only if the trial court's judgment is not supported by substantial evidence of probative value or if we are left with a definite and firm conviction a mistake has been made. *McCarty*, 857 N.E.2d at 443.

### A. Existence of Trade Secrets

■■■■ The Gosherts first argue that the trial court erred in finding the exis-

12. In further support of its argument that the mere creation of the letter constituted a material breach of the Agreements by the Gosherts, Silveus directs us to this Court's opinion in *Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190 (Ind.Ct.App.2001). In *Cohoon*, an employee had prepared an advertising brochure for a competing entity while he was still employed by the former employer. *Id.* at 197. However, as Silveus itself notes, we found that the employee's *removal* of this brochure from his computer following his termination constituted a first breach. *See* Appellants' Br. p. 40; *see also Cohoon*, 760 N.E.2d at 197.

13. We will further discuss Silveus' conversion claim against the Gosherts in Section VII of this opinion, *infra*.

14. The Gosherts also argue in their cross-appeal that "[t]he trial court erred by finding that Rick [Goshert] was an employee" of Silveus rather than an independent contractor. Appellees' Br. p. 47. They base this argument on the trial court's Finding of Fact 26, in which the court described Rick Goshert's "programming duties as an employee of [Silveus]." Appellants' App. p. 21. However, this brief, solitary statement by the trial court does not amount to a "finding" that Rick Goshert was an employee of Silveus. Whether Rick Goshert was an employee or an independent contractor was not an issue before the trial court, and no part of the court's judgment turned on its statement that he was an "employee." As such, the statement was superfluous and without legal effect, and we need not address the Gosherts' argument.

tence of trade secrets. The Indiana Uniform Trade Secrets Act ("IUTSA") defines "trade secret" as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind.Code § 24-2-3-2. Thus, a protectable trade secret has four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known, or readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy. *Hydraulic Exchange & Repair, Inc. v. KM Specialty Pumps, Inc.*, 690 N.E.2d 782, 785-86 (Ind.Ct.App.1998). Whether information constitutes a trade secret is a fact-sensitive determination, but ultimately, it is a determination for the court to make as a matter of law. *Coleman v. Vukovich*, 825 N.E.2d 397, 405 (Ind.Ct.App.2005).

The Gosherts first assert that the trial court found the names of Silveus' clients and potential clients to be trade secrets and that such information does not constitute a trade secret because it is readily available from other sources. *See* Appellees' Br. p. 36-37 (citing *M.K. Plastics Corp. v. Rossi*, 838 N.E.2d 1068, 1077 (Ind. Ct.App.2005)). But the trial court did not find that the names, standing alone, constitute trade secrets. Rather, the trial court concluded that the Gosherts had misappropriated more detailed customer information, such as farm descriptions, past insurance coverage, and loss histories. *See* Appellants' App. p. 11 (Conclusions of Law 13-17). As such, the Gosherts' narrow argument as to the names is inapposite.

▪ The Gosherts also claim that the trial court erred in finding that the loss histories constituted a trade secret. They maintain that "all parties testified that this information was publicly available via the free GRP software, among other sources." Appellees' Br. p. 37. They direct us to the testimony of Rick Goshert found on pages 1371-1374 of the transcript. But while those pages contain a general discussion of the GRP software, there is nothing to be found regarding loss histories, let alone the specific loss histories of Silveus' existing or potential clients. Therefore, the Gosherts' argument as to the status of loss histories as a trade secret is without merit.

The bulk of the Gosherts' trade secrets argument revolves around whether the information at issue was the subject of reasonable efforts to maintain its secrecy. Their first contention is limited to the existence of confidentiality agreements. They note that Richard Riedel, a relative of the Gosherts, worked for Silveus for a time but was not required to sign a confidentiality agreement; that Rick Goshert, before he began selling crop insurance for Silveus, designed customer databases for Silveus without having signed a confidentiality agreement; and that Steve Simms, Steve Silveus' cousin, was hired to do "damage control" after the Gosherts' termination and was not required to sign a confidentiality agreement. But the fact that not every employee was required to sign a confidentiality agreement does not necessarily mean that an owner has failed to undertake reasonable efforts to maintain the secrecy of its information. *See Zemco Mfg., Inc. v. Navistar Int'l Transp.*

*Corp.*, 759 N.E.2d 239, 247 (Ind.Ct.App. 2001) (noting that "an explicit promise of confidentiality is not necessary if the recipient of the information knew or should have known that the information was a trade secret and the owner expected the recipient to keep the information secret.") (citing *Flotec, Inc. v. S. Research, Inc.*, 16 F.Supp.2d 992, 1006 (S.D.Ind.1998)), *reh'g denied, trans. denied.* Furthermore, even if Rick Goshert did not initially sign a confidentiality agreement, it is undisputed that he did so when he began selling crop insurance for Silveus. And as for Simms, Steve Silveus testified that he was given access to Silveus' customer information for the limited purpose of performing damage control after the Gosherts were terminated and began competing against Silveus. *See* Tr. p. 366–67.

Finally, the Gosherts contend that the trial court erred to the extent that it found that certain software utilized by Silveus and its agents constituted trade secrets, namely, the "MPCI Comparison Analysis Software," the "GRIP Analysis Software," and the "Swanware" software, also known as "CropCalc" or "What If." *See* Appellees' Br. p. 39–44. However, the trial court's primary concern was not with the software itself. *See, e.g.*, Appellants' App. p. 20 (Finding of Fact 6) ("[A]lthough the original software GRP was generally available to the public, its particular method of use by Silveus was unique to Silveus."); *see also id.* at 18 (Findings of Fact 2 and 3) (trial court disclaiming any responsibility for determining issues related to copyrights). Rather, its focus was on *the information compiled through the use of that software*, such as the farm descriptions, past insurance coverage, and loss histories. Any dispute as to the ownership or licensing of the software is not properly before us. In this regard, we note that after Silveus filed this suit, Goshert sued Silveus in federal court over the development and ownership of the MPCI software. *See Goshert Enters., Inc. v. Silveus Ins. Group, Inc.*, No. 3:03cv0139 AS (N.D.Ind. 2003). An appeal in that case is currently pending before the United States Court of Appeals for the Seventh Circuit. *See Goshert Enters., Inc. v. Silveus Ins. Group, Inc.*, No. 06–2426 (7th Cir.2006).

The trial court did not err as a matter of law in determining that Silveus possessed trade secrets. Therefore, we turn to the Gosherts' arguments regarding the misappropriation of those trade secrets.

## B. Misappropriation

Next, the Gosherts maintain that even if the trial court properly found that trade secrets existed, it erred in concluding that the Gosherts misappropriated those trade secrets.[15] IUTSA defines "misappropriation" as:

---

15. In part, the Gosherts argue that there is no evidence that they misappropriated Silveus' trade secrets "prior to termination." Appellees' Br. p. ii, 44. In essence, they contend that if there was misappropriation, it did not occur until after Silveus materially breached the Agreements by terminating the Gosherts without giving them thirty days' notice, and therefore Silveus is precluded from enforcing the other terms of the Agreements. *See Licocci*, 492 N.E.2d at 52 ("A party first guilty of a material breach of contract may not maintain an action against the other party or seek to enforce the contract against the other party should that party subsequently breach the contract."). But Silveus' misappropriation claim was not based on the Agreements. Rather, it was a statutory claim based on Indiana Code chapter 24-2-3. *See* Appellants' App. p. 27A–34 (Complaint, p. 34). Therefore, while Silveus, as the first party to commit a material breach, is precluded from enforcing the terms of the Agreements, such as the covenants not to compete, *see Licocci*, 492 N.E.2d at 52, it is free to proceed with any non-contract-based claims. Simply put, the Silveus' breach of the Agreements did not give the Gosherts freedom to misappropriate Silveus' trade secrets, *i.e.*, to violate a statute.

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) used improper means to acquire knowledge of the trade secret;

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

I.C. § 24-2-3-2.

■ The trial court concluded that the Gosherts misappropriated Silveus' trade secrets by Rick Goshert's taking of back-up tapes containing the trade secrets in question. *See* Appellants' App. p. 25 (Conclusion of Law 17). The Gosherts rely on the testimony of Rick Goshert that there were ten back-up tapes and that he did not take any of them after his termination. *See* Tr. p. 1455. However, Cocks testified that before he was put in charge of the back-up tapes in his role as Silveus' new IT manager, Rick Goshert was responsible for the tapes. *See id.* at 503. He further testified that two additional tapes existed and that they were no longer in Silveus' possession. *See id.* at 505, 507, 509. The

Gosherts emphasize Cocks' testimony that "[w]here they're located would be speculation[.]" *Id.* at 509. But the testimony that the back-up tapes were missing and the undisputed fact that Rick Goshert had access to them just before he was terminated constitute circumstantial evidence that supports the trial court's finding that Rick Goshert took back-up tapes from Silveus. Indeed, Cocks implicated Rick Goshert by testifying as to the back-up tapes, "I believe I understand where they're at." *Id.*

In addition to Cocks' testimony, several exhibits support the trial court's finding that Rick Goshert took back-up tapes and that the Gosherts used those tapes. For example, Exhibit 25 is a collection of Goshert Insurance, LLC documents for farmer Douglas Johnson, and Exhibit 26 is a collection of Silveus documents for Johnson. The exact same land descriptions, including FSA numbers and farm names, are included in both sets of documents, and they appear in the exact same order. *See* Appellants' App. p. 88, 94–95. Likewise, the results of the Gosherts' "GRI-PAY Option Analyzer" and Silveus' "GRI-PAY Loss Pay Calculator" for Elkhart County are identical, as are the layouts of the documents. *See id.* at 271, 273 (Exs. 173 and 175). The striking similarity between the Goshert documents and the Silveus documents strongly supports an inference of misappropriation.

There is substantial evidence of probative value supporting the trial court's judgment that the Gosherts misappropriated Silveus' trade secrets.

### VI. Damages

■ Silveus also challenges the trial court's damage calculations. Generally, the computation of damages is a matter within the sound discretion of the trial court. *Brandeis Mach. & Supply Co. v. Capitol Crane Rental, Inc.,* 765 N.E.2d

173, 177 (Ind.Ct.App.2002). A damage award will not be reversed upon appeal unless it is based on insufficient evidence or is contrary to law. *Id.* In determining whether the award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. *Id.*

The trial court awarded Silveus $512,170.91 in damages "based upon the Court's estimation of the net profits of the [Gosherts] and the advantages gained by the [Gosherts] in the use of [Silveus'] trade secrets." Appellants' App. p. 26–27. However, the trial court also awarded the Gosherts $512,170.91 in damages "suffered by them upon [Silveus'] material breach of the agreement regarding notice and depriving them (in total) of $489,000.00 in 'buy out'; monies owing David [Goshert], $8,547.22; monies owing Rick [Goshert], $12[,]834.62; and monies owing Richard [Goshert], $1,789.07 (O'Neill premium)." *Id.* at 26. Because the awards were equal, the trial court set them off against each other. *See id.* at 27.

Much of Silveus' damages argument is based on its contention that the trial court erred in concluding that the Gosherts were entitled to thirty days' notice before termination and that Silveus was the first party to materially breach the Agreements by failing to provide the Gosherts with such notice. Specifically, Silveus argues that it is entitled to damages based upon the Gosherts' violation of the covenants not to compete in the Agreements. But, as we found in Section IV of this opinion, *supra,* the trial court properly found that Silveus was the first to breach and is therefore precluded from enforcing the covenants not to compete. As such, we need not address the parts of Silveus' damages argument based on the covenants not to compete.

■ Silveus' only other argument regarding damages is that the trial court erred in awarding the Gosherts $489,000.00 in "buy out" money. Again, Paragraph 15(b) of the Agreements, which applies to vested salesmen such as the Gosherts, provides, in pertinent part:

If Salesman has obtained a vested interest in the insurance business written by Salesman pursuant to the provisions of paragraph 13 of this Agreement (procuring $200,000 or more in annual insurance premium sales), then Salesman shall be entitled to receive commissions on all premiums on insurance business written by Salesman, accrued and payable prior to the effective date of termination. Furthermore, Agency shall compensate Salesman for his vested interest in such insurance business in an amount of 1½ times Salesman's share of crop hail insurance commissions for such insurance business which (1) existed during the year of termination, *AND (2) which insurance business is renewed for the year following the year of termination, AND (3) Agency is fully paid for such insurance for the year following the year of termination;* plus an amount of 1 times Salesman's share of multi-peril crop insurance commissions for such insurance business which (1) existed during the year of termination, AND *(2) which insurance business is renewed for the year following the year of termination, AND (3) Agency is fully paid for such insurance for the year following the year of termination.*

*Id.* at 31 (emphases added); *see also id.* at 37, 43, 48–49. Silveus contends that the trial court erred because it awarded the Gosherts damages under this "buy out" provision "even though [the Gosherts] failed to renew the business with Silveus and Silveus was not paid for such business." Appellants' Br. p. 29. But Silveus misses the point. Because Silveus termi-

nated the Gosherts without first giving them thirty days' notice, thereby breaching the Agreements, the Gosherts were not able to renew existing policies or to. sell any new policies. As such, they were deprived of the opportunity to earn as much as they would have received in buy out money under Paragraph 15(b). In this regard, the Gosherts were not "bought out" under Paragraph 15(b). Rather, they were. awarded damages because Silveus deprived them of the full value of the potential buy out by terminating them without thirty days' notice. The trial court did not abuse its discretion in awarding the Gosherts damages relating to the buy out provision of Paragraph 15(b).

Silveus has failed to show that the trial court's offsetting damages awards fell outside the scope of the evidence.

## VII. Attorney Fees for Silveus' Conversion Claim

Finally, Silveus argues that the trial court erred by failing to award it attorney fees on its claim that the Gosherts converted certain of Silveus' trade secrets. Indiana Code § 34–24–3–1 provides, in pertinent part:

If a person suffers a pecuniary loss as a result of a violation of IC 35–43,[16] IC 35–42–3–3, IC 35–42–3–4, or IC 35–45–9, the person may bring a civil action against the person who caused the loss for the following:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.

\* \* \* \*

(3) A reasonable attorney's fee.

\* \* \* \*

Silveus correctly notes that when a party prevails in a suit under Indiana Code

§ 34–24–3–1 and proves that attorney fees have been incurred, an award of attorney fees is mandatory. *Patricia Ann Brown, C.P.A. v. Brown,* 776 N.E.2d 394, 397 (Ind. Ct.App.2002), *trans. denied; Browning v. Walters,* 616 N.E.2d 1040, 1045 (Ind.Ct. App.1993), *modified on other grounds on reh'g,* 620 N.E.2d 28 (Ind.Ct.App.1993); *Burgett v. Haynes,* 572 N.E.2d 1296, 1298 (Ind.Ct.App.1991); *Roake v. Christensen,* 528 N.E.2d 789, 792 (Ind.Ct.App.1988). The trial court only has discretion as to the amount of the attorney fees. *See Brown,* 776 N.E.2d at 397–98.

But here, Silveus did not prevail on its conversion claim. The trial court concluded:

17. The Court finds and concludes that the [Gosherts] misappropriated [Silveus'] trade secrets, and the trade secrets so misappropriated are essentially the same items of property which the [Gosherts] converted, (that is, the backup tapes that contained many of the appropriated trade secrets, technically their return should have occurred under paragraph 15(c) of the agreement). The Court elects to enter judgment against the [Gosherts] for the misappropriation of [Silveus'] trade secrets by [Rick Goshert's] conversion of the back-up tapes.

Appellants' App. p. 25. Even though the trial court's Conclusion of Law 17 indicates that Goshert "converted" Silveus' property, it is clear that the trial court only entered judgment in favor of Silveus on its misappropriation claim and not on its conversion claim, and Silveus does not appeal that decision. With no judgment in its favor, we cannot say that Silveus prevailed on its conversion claim. Therefore, the trial court did not err in failing to award

16. IC 35–43 includes the criminal conversion statute, which is codified at Indiana Code § 35–43–4–3.

Silveus attorney fees arising from that claim.

### Conclusion

We affirm the trial court's judgment and damages award in favor of the Gosherts and against Silveus on the parties' respective breach of contract claims. We also affirm the trial court's judgment and damages award in favor of Silveus on its claim for misappropriation of trade secrets. Finally, we affirm the trial court's refusal to award Silveus attorney fees on its conversion claim.

Affirmed.

ROBB, J., and BRADFORD, J., concur.