896 N.E.2d 1207 (2008)
HAAG TRUCKING CO., INC., Appellant-Plaintiff, and
Rose Maxine HAAG, Appellant (Counter-Defendant),
v.
Mark E. Haag and Perfect Pallets, Inc., Appellees-Defendants.
No. 49A02-0712-CV-1112.
Court of Appeals of Indiana.
November 26, 2008.
*1209 Mark R. Galliher, Doyle & Friedmeyer, P.C., Thomas E. Hastings, The Hastings Law Firm, Indianapolis, IN, Attorneys for Appellant.
Philip A. Whistler, Michael A. Wilkins, Hilary G. Buttrick, Jenny R. Wright, Ice Miller, LLP, Indianapolis, IN, Attorneys Appellee.
VAIDIK, Judge.

Case Summary
This litigation concerns a family's battle over the pieces of three Indianapolis-based family businesses left behind after the 2003 death of Robert Haag. Rose Maxine Haag ("Maxine"), Robert's widow and one of the plaintiffs below, appeals from the trial court's judgment against her personally for a breach of fiduciary duty as a shareholder of Perfect Pallets, one of the three businesses. Mark Haag, Robert's and Maxine's son and one of the defendants below, cross-appeals the trial court's judgment that he was not frozen out as a shareholder of Haag Trucking, another one of the family businesses. Concluding that the trial court's decision regarding Maxine is not clearly erroneous and that the trial court's decision regarding Mark is not contrary to law, we affirm.

Facts and Procedural History
In 1975, Robert incorporated Haag Trucking, a trucking business that employed drivers and provided trucks to haul merchandise for hire. A few years later, Robert sold five shares of Haag Trucking to his son, Mark. Robert later gifted additional shares to Mark. In 1985, Robert and Mark incorporated for liability reasons a second business, Robert Haag Distribution and Warehousing ("RHDW"), to build and operate the office building from which Haag Trucking conducted business. In 1991, Robert, Mark, and another investor, John Rossman, incorporated a third business, Perfect Pallets. Eventually, Perfect Pallets bought back Rossman's stock, leaving Mark as the company's majority shareholder and Robert as the minority shareholder.
Perfect Pallets provided reusable hard plastic pallets to newspaper printers, who used them to transport advertising inserts to newspapers. The newspapers would then return the pallets to Perfect Pallets, and the cycle would begin again. Sometimes, a newspaper would send a pallet past its original intended destination, but embossed into the pallets were a 1-800 number and instructions for pallet recipients to call Perfect Pallets and schedule a time when Perfect Pallets could retrieve these wayward pallets. This 1-800 number was the principal means to contact Perfect Pallets, as the number was also listed in the phone book and printed on all of Perfect Pallets' invoices, checks, and advertisements. Perfect Pallets generally received 1000 calls per month on this number, making it essential to its business. Although the number was initially in Perfect *1210 Pallets' name, the number was later bundled into Haag Trucking's phone package to cut costs. Perfect Pallets reimbursed Haag Trucking for its share of the phone bill under a management agreement, which also provided that if the companies ever terminated the agreement, then Haag Trucking would cooperate in an orderly transfer of the 1-800 number back to Perfect Pallets.
Robert and Mark worked together full-time six days per week to build and maintain these three family businesses. In 2003 Robert died. He was survived by his widow, Maxine, and their four children: Mark, Gordon Haag, Nancy Mazelin, and Norma Wolf. Maxine, Gordon, Nancy, and Norma had never been involved with the management of Haag Trucking, RHDW, or Perfect Pallets. Under Robert's will, Maxine was the sole beneficiary and personal representative of Robert's estate. However, Maxine was unhappy to learn that the real estate housing Haag Trucking was titled jointly in Robert and Mark's name with right of survivorship. Additionally, RHDW and Perfect Pallets both had buy-sell agreements allowing the survivor to buy the decedent's interests. There was no buy-sell agreement in place for Haag Trucking, but Robert's will provided that his children could purchase his interests at an appraised price. Mark began negotiations to purchase the shares Maxine inherited from Robert by sending Maxine a fax, illustrating that the purchase price of $575,000 for the shares combined with the other assets she had inherited could provide her with sufficient income for life. Nevertheless, Maxine became concerned that Mark would claim most of Robert's estate and leave little for her.
On October 22, 2003, Maxine, as Robert's personal representative, held a board meeting for Haag Trucking. Mark and Maxine unanimously elected Gordon as a director. Gordon and Maxine, now voting together as two of the three directors of Haag Trucking, elected Maxine to replace Mark as President of Haag Trucking, voted to pay Maxine a salary of $52,000 per year, elected Gordon as Vice-President, and elected Mark as Secretary/Treasurer.
Over the next few weeks, tension built between Mark, Gordon, and Maxine. Maxine told Mark that she was bringing in someone from outside the company to review the company's past expenses. Maxine ordered Mark not to take any action on behalf of the company without her approval. Mark witnessed Gordon and Maxine meeting with an attorney who was not one of the corporation's attorneys in Haag Trucking's parking lot. Gordon, believing that Mark had challenged his authority by authorizing a $500 repair payment without his permission, went to Mark's office, where a physical altercation ensued. Mark asked Maxine if she intended to address this incident, and she responded that she did not intend to do so.
By late November, Mark was convinced that Maxine intended to sue him. At a special meeting of the board of directors for Haag Trucking, Mark attempted to bring his attorney with him, but Maxine, who had brought her own attorney, refused to allow Mark's attorney to attend. Maxine's attorney attempted to question Mark, but Mark refused to cooperate because his attorney had been excluded. Maxine and Gordon voted to stop paying rent to Mark for the real estate occupied by Haag Trucking and to gather evidence for a lawsuit, which Mark correctly assumed would be against him. Four days later, Mark resigned as an officer, director, and employee of Haag Trucking, the company for which he had worked for thirty years.
*1211 After Mark left Haag Trucking, Mark told Maxine that he wanted to arrange for the transfer of the 1-800 number used by Perfect Pallets from Haag Trucking to Perfect Pallets alone pursuant to the companies' management agreement. Maxine responded by letter, demanding $10,000 per month in rent for the number. The actual monthly cost to Haag Trucking for Perfect Pallets' share of the telephone bill was $65, and Haag Trucking did not use the number for any purpose itself. Mark refused to pay Maxine's demand. Mark's sister Nancy, now working at Haag Trucking under Maxine's supervision, then put a block on the number so that no one else could obtain access to it. Instead of forwarding information for Perfect Pallets, individuals calling the 1-800 number were given a message about how to meet exciting local people. Sometimes Nancy received calls at Haag Trucking for Perfect Pallets or for Mark, and instead of giving forwarding information she would only respond that there was no such company at that address or that Mark no longer worked there.
In December 2003, Haag Trucking sued Mark, his wife Marilyn Haag, and Perfect Pallets, alleging breach of fiduciary duty, usurpation of corporate opportunities, conversion, interested director transactions, and fraud. Haag Trucking asked that the court order that Mark deed to Haag Trucking the real estate that housed it, that all shares of RHDW and Perfect Pallets be transferred to Haag Trucking, and that the defendants pay damages to Haag Trucking. The defendants counterclaimed, alleging that the plaintiffs' claims were barred by the statute of limitations, that Mark was a victim of freeze-out by Haag Trucking, and that Haag Trucking interfered with Perfect Pallets' ability to retrieve its pallets. The defendants asked for indemnification for the costs of Mark's defense pursuant to Indiana Code § 23-1-37-9.
In its July 12, 2007, decision, the trial court found that Haag Trucking failed to prove its claims because Robert was competent and not a fraud victim when he structured his businesses and executed his will. The trial court found that Perfect Pallets was entitled to judgment against Haag Trucking and Maxine for damages worth $110,000 caused by interference with and failure to assign the 1-800 number. Perfect Pallets was also entitled to payments for various other services and loans. The trial court ordered Haag Trucking to pay rent it owed to Mark for use of the real estate and quieted title to the real estate but denied Mark's request that Haag Trucking be evicted from the property. The trial court found that Mark was entitled to statutory indemnity for the cost of his defense. Finally, the trial court found that Mark was not entitled to damages for freeze-out from Haag Trucking. Maxine now appeals and Mark cross-appeals from this order.

Discussion and Decision
In this case, the trial court issued its judgment in narrative form. The trial court did not separate its findings and conclusions into numbered paragraphs, but they are evident from the judgment. Generally, when the trial court enters findings of fact and conclusions of law, its findings and conclusions shall not be set aside unless clearly erroneous. Steve Silveus Ins., Inc. v. Goshert, 873 N.E.2d 165, 171 (Ind. Ct.App.2007). A finding or conclusion is clearly erroneous when a review of the evidence leaves us with the firm conviction that a mistake has been made. Id. We review the judgment by determining whether the evidence supports the findings and whether the findings support the judgment. Id. We consider only the evidence favorable to the judgment and all reasonable *1212 inferences to be drawn from that evidence. Id. We neither reweigh the evidence nor assess witness credibility. Id.
Maxine argues that the trial court erred by finding her personally liable for the interference with Perfect Pallets' 1-800 number both because she did not have notice of this claim against her and because she did not breach her fiduciary duty to Perfect Pallets or otherwise interfere with Perfect Pallets' business. Mark cross appeals, arguing that the trial court erred by finding that he was neither the victim of a freeze-out nor entitled to the fair value of his minority shares in Haag Trucking.

I. Breach of Fiduciary Duty
Maxine contends that, because Perfect Pallets' counterclaim did not expressly state a claim against Maxine personally based on interference with the 1-800 number, Maxine did not have notice of this claim against her. Maxine also contends that even if Perfect Pallets had asserted such a claim against her, there is no ground for such liability. We disagree.

A. Notice of Breach of Fiduciary Duty Claim
Maxine argues that the judgment against her personally was clearly erroneous "because Perfect Pallets never sued Maxine for preventing its use of the Toll Free Number." Appellant's Br. p. 10. In their Counterclaim, Mark and Perfect Pallets alleged five counts against Haag Trucking, Maxine, and Gordon as counter-defendants. In Count III, Perfect Pallets alleged that Haag Trucking, Maxine, and Gordon intentionally interfered with Perfect Pallets' business relations by falsely and maliciously informing Perfect Pallets' customers who had called Haag Trucking that there was no company by that name at that number. Count III also alleged that Haag Trucking, Maxine, and Gordon falsely and maliciously informed Perfect Pallets' job applicants who presented themselves at the Haag Trucking office instead of the Perfect Pallets office upstairs that there was no such company at that address. In Count IV, Perfect Pallets alleged that Haag Trucking had breached the management agreement between the two companies by failing to assign the 1-800 number. In Count V, Mark alleged that Maxine and Gordon had intended to force Mark out of Haag Trucking and that "[a]s a result of their gross mismanagement, breaches of fiduciary duty, and waste of corporate assets, Mark's ownership interest in Haag Trucking has been rendered, or will be rendered, worthless." Appellant's App. p. 158. Maxine correctly notes that nowhere in the counterclaim do Mark or Perfect Pallets allege that Maxine personally is responsible for interference with the 1-800 number. In their amended counterclaim, Mark and Perfect Pallets made the same allegations as in the original counterclaim and added a count for the conversion of Mark's Indianapolis Colts tickets but again did not allege that Maxine was personally responsible for interference with Perfect Pallets' 1-800 number.
In their pretrial contentions, the defendants argued that, as a shareholder of Perfect Pallets, Maxine owed a fiduciary duty to Mark and Perfect Pallets. The defendants also argued that both Haag Trucking and Maxine had breached their fiduciary duties by interfering with Perfect Pallets' use of the 1-800 number embossed on its pallets. Id. at 206b-206c. In the defendants' pretrial brief, they argued that "Perfect Pallets has a claim for interference with its 1-800 number, both against Haag Trucking, and against Maxine Haag for breach of fiduciary duty and for tortious interference with a business relationship." Id. at 234. In their pretrial brief, the defendants explained that Maxine and other Haag Trucking employees refused to *1213 forward calls to Perfect Pallets directed at the 1-800 number, which rang in the Haag Trucking office, because the line was included in Haag Trucking's phone package. Id. The defendants also noted that Maxine had refused to assign the 1-800 number to Perfect Pallets despite the fact that Haag Trucking had no business purpose for the number. The defendants stated that when Mark asked for access to the number pursuant to the management agreement that governed the separation between Haag Trucking and Perfect Pallets, Maxine responded by offering to rent the number, which had a monthly bill around $65, for $10,000 per month. After Mark refused this demand, Haag Trucking blocked the number. Id. In the request for relief, the defendants asked that the trial court "grant judgment in favor of Perfect Pallets on its counterclaim against Haag Trucking and Maxine Haag for damages caused by interference with its 1-800 number[.]" Id. at 236.
At trial, the defendants' counsel had the following exchange with Maxine on cross-examination regarding the 1-800 number:
Defense Counsel: Did you think it probably cost less than $10,000 a month?
Maxine: That wasn't the reason for doing this. We were short on money and it would just be a way someone we would be able to raise money to pay bills and be able to go to another phone system.
Defense Counsel: Do you think there was anybody who would pay $10,000 a month for that number?
Maxine: I don't know.
Defense Counsel: The reason you thought he might pay you $10,000 a month for that number is they needed that number desperately in their business, wasn't it?
Maxine: I don't know.
Defense Counsel: In February of 2004 you were actually a minority shareholder in Perfect Pallets, weren't you?
Maxine: Yes.
Defense Counsel: And would you agree that 
Plaintiff Counsel: Clarify that. You mean in her capacity as personal representative?
Defense Counsel. Sure. In whatever capacity, you were a shareholder of Perfect Pallets in February of 2004, weren't you?
Maxine: I wasn't getting any money, though, and we needed money.
Defense Counsel: Mark wasn't getting any money as a shareholder of Haag Trucking in February of 2004 either, was he?
Maxine: That's why we're here today to get this settled.
Defense Counsel: Would you agree that as a shareholder of Perfect Pallets you had a duty to deal fairly, openly and honestly with Perfect Pallets?

Maxine: Well, I thought I did.
Defense Counsel: Did you think it was fair to charge Perfect Pallets $10,000 a month to keep its old 800 number?
Maxine: I had no idea what it was worth.
Tr. p. 400-01 (emphasis added).
In the defendants' proposed judgment entry, the defendants wrote that "Perfect Pallets is entitled to judgment against Haag Trucking, Inc. and Maxine Haag for damages caused by Haag Trucking's interference with, and failure to assign, an 800 number that was used by Perfect Pallets, which resulted in substantial and foreseeable losses in the amount of approximately $252,000." Appellant's App. p. 245. The defendants also wrote that
[d]espite this clear understanding and obligation  and despite Maxine Haag's *1214 personal fiduciary obligations as a shareholder of Perfect Pallets  Haag Trucking, and Maxine Haag, refused to allow the 800 number to be transferred to Perfect Pallets. Instead, they blocked that number.... Before blocking the number, Maxine Haag first demanded a payment of $10,000 per month, although the actual cost of the number was closer to $65 per month.
Id. at 276. The trial court issued findings and judgment consistent with the defendants' claim that Maxine had breached her fiduciary duty as a shareholder of Perfect Pallets by her interference with the 1-800 number.
Regarding the trial of unpled claims, Trial Rule 15(B) provides in pertinent part that
[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but failure so to amend does not affect the result of the trial of these issues.
The Indiana Supreme Court has explained that the "policy behind Trial Rule 15(B) is to promote relief for a party based upon the evidence actually forthcoming at trial, notwithstanding the initial direction set by the pleadings." Ayr-Way Stores, Inc. v. Chitwood, 261 Ind. 86, 300 N.E.2d 335, 338 (1973). The Court quoted with approval from Indianapolis Transit System, Inc. v. Williams, 148 Ind.App. 649, 269 N.E.2d 543, 550 (1971):
Whether the "issues" to be tried in any law suit are formed by the pleadings or in a pre-trial order, their function is merely to provide the parties and the court with an itinerary for the journey through the trial. Either party may timely demand strict adherence to the predetermined route or, if deviation is permitted, the time necessary to prepare to meet the new issue. But when the trial has ended without objection as to the course it took, the evidence then controls. Neither pleadings, pre-trial orders, or "theories" postulated by either party should then operate to frustrate the trier of fact in finding the facts which that evidence (including all reasonable inferences the trier may draw therefrom) convinces him (whether he be a judge or juror), by a preponderance thereof, is true or block him from awarding the relief, if any, which the rules of substantive law say those facts merit. (Emphasis added.)
Ayr-Way Stores, Inc., 300 N.E.2d at 340. Although a party failed to plead a legal theory in its complaint, its pretrial contentions can provide adequate notice of the issue for trial. Lawyers Title Ins. Corp. v. Pokraka, 595 N.E.2d 244, 248 (Ind.1992). In Pokraka, the plaintiffs did not rely on a breach of contract theory at trial and the trial court did not base its judgment on that theory. Id. Nevertheless, this Court upheld the lower court's judgment against the defendants, finding that the defendants had adequate notice because the plaintiffs' pretrial contentions made specific reference to the contract at issue and the trial court made findings consistent with a contract theory. Id.
Although Mark and Perfect Pallets did not allege that Maxine had breached her fiduciary duty to Perfect Pallets by blocking the 1-800 number in their complaint, they did allege such in their pretrial contentions and at some length in their pretrial brief. At trial, the defendants' counsel questioned Maxine without objection about her fiduciary duty to Perfect Pallets *1215 as a shareholder by virtue of her position as personal representative of Robert's estate and whether she had breached that fiduciary duty. In their proposed judgment, the defendants argued that Maxine was personally liable, and the trial court made findings and a judgment consistent with this theory. Maxine had adequate notice that this claim was properly a part of Mark's and Perfect Pallets' claims against her.

B. Breach of Fiduciary Duty to Perfect Pallets
Maxine next argues that even if Perfect Pallets had asserted a claim against her for interfering with the 1-800 number, such a claim would fail under Indiana law and the facts of this case. We disagree.
On July 2, 2003, Robert's will was probated in open court. The will named Maxine as the personal representative of Robert's estate. Appellees' App. p. 178. Maxine was also the sole beneficiary under Robert's will. Id. at 176. As the sole beneficiary, Maxine was to receive all of Robert's shares in the family businesses, including Perfect Pallets. However, Robert and Mark had agreed in Perfect Pallet's pre-incorporation agreement that if Robert died while Mark was still living, then Robert's personal representative would be obligated to sell and Mark would be obligated to buy all of Robert's shares. Id. at 217. The trial court found in its judgment that Maxine was a shareholder of Perfect Pallets, and the parties agree that Maxine was a shareholder by virtue of her status as personal representative. However, Perfect Pallets argues that Maxine was also de facto owner of the shares by virtue of her status as the sole beneficiary of Robert's estate. Maxine counters by noting that even if she were the owner outright, her ownership is limited by the pre-incorporation agreement that the shares be sold to Mark.
Whether she was a shareholder by virtue of her status as a personal representative or as a sole beneficiary, Maxine owed a fiduciary duty to Perfect Pallets. A personal representative is regarded as a trustee appointed by law for the benefit of and the protection of creditors and distributees. Fall v. Miller, 462 N.E.2d 1059, 1061 (Ind.Ct.App.1984). Title to a decedent's personal property vests in the personal representative, where it remains until the property is sold and the proceeds are applied to pay debts and estate administration costs before distribution to the heirs and devisees. Id. at 1063. However, the personal representative does not have absolute power over the personalty but must dispose of it pursuant to statute and the court's orders. Id. Before distribution, the personal representative has a duty to protect and preserve the assets of the estate so they may be properly distributed to the rightful heirs and devisees of the decedent. Estate of Daniels ex rel. Mercer v. Bryan, 856 N.E.2d 763, 768 (Ind.Ct.App.2006). A personal representative is liable for any negligent or willful act or nonfeasance in the administration of the estate that causes loss to the estate. Ind. Code § 29-1-16-1.
Shareholders in a close corporation owe a fiduciary duty as well. A close corporation is one which typically has few shareholders and whose shares are not generally traded in the securities market. W & W Equipment Co., Inc. v. Mink, 568 N.E.2d 564, 570 (Ind.Ct.App.1991). The fiduciary duty owed is the same whether it arises from the capacity of a director, officer, or shareholder in a close corporation. G & N Aircraft, Inc. v. Boehm, 743 N.E.2d 227, 240 (Ind.2001). "The fiduciary must deal fairly, honestly, and openly with his corporation and fellow stockholders." Id. (quoting Hartung v. Architects Hartung/Odle/Burke, Inc., 157 Ind.App. 546, 301 N.E.2d 240, 243 (1973)).
*1216 Because she was the personal representative of Robert's estate and sole beneficiary of Robert's minority shares in Perfect Pallets, Maxine owed a duty to Perfect Pallets. Despite the buy-sell agreement which would eventually come into play once Maxine owned the shares outright, it was Maxine's fiduciary responsibility to safeguard the shares until they could be distributed to her and then sold to Mark pursuant to Robert's arrangements. Maxine did not deal fairly with Perfect Pallets and safeguard the value of these shares. Instead of transferring the 1-800 number to Perfect Pallets pursuant to the management agreement previously in place between Perfect Pallets and Haag Trucking, Maxine decided first to charge "rent" of $10,000 per month for the phone line, which had a monthly bill of $65. When Mark refused, under Maxine's supervision Haag Trucking put a block on the number instead of releasing it so that Perfect Pallets would never be able to obtain the number molded into their plastic pallets. Perfect Pallets, which had previously received 1000 calls a month to this line, depended on this number to perform its business. As a result of this interference with the 1-800 number, the trial court found that Maxine caused $110,000 worth of damage to Perfect Pallets. We agree that this interference was a breach of Maxine's fiduciary duty and that Maxine is personally liable for her breach.[1]

II. Freeze-out
In his cross-appeal, Mark contends that he is entitled to relief for being frozen out of Haag Trucking.[2] Specifically, Mark asks for damages or a buy-out of his shares due to a pattern of Maxine's conduct that culminated in Mark being frozen out of Haag Trucking. The trial court did not find that Maxine had breached her fiduciary duty to Mark as a shareholder of Haag Trucking by engaging in a pattern of oppressive conduct. Appellant's App. p. 60.
Mark bore the burden of proof on his freeze-out claim at trial and did not prevail; therefore, he is appealing from a negative judgment. When a party appeals from a negative judgment, it must demonstrate that the trial court's decision is contrary to law; that is, that the evidence points unerringly to a conclusion different from that reached by the trial court. Hopper Res., Inc. v. Webster, 878 N.E.2d 418, 422 (Ind.Ct.App.2007) (citing Bennett v. Broderick, 858 N.E.2d 1044, 1048 (Ind.Ct. App.2006), trans. denied), reh'g denied, trans. denied.
*1217 A freeze-out is the use of corporate control vested in the statutory majority of shareholders or the board of directors to eliminate minority shareholders from the corporation or reduce the minority shareholders' voting power or claims on corporate assets to relative insignificance. Mink, 568 N.E.2d at 574 (citing Gabhart v. Gabhart, 267 Ind. 370, 370 N.E.2d 345, 353 (1977)). A freeze-out implies a purpose to force upon the minority shareholder a change which is not incident to any other business goal. Id. Courts faced with freeze-out issues must reconcile conflicting policies: maximizing shareholder benefits and treating shareholders equally. Id. "On the one hand is the necessity to provide adequate protection for the interests and expectations of minority shareholders, and the other is the necessity of allowing sufficient corporate flexibility, as is required by modern commerce." Gabhart, 370 N.E.2d at 353-54.
Mark correctly notes that some of the evidence before the trial court tends to show a freeze-out from Haag Trucking. Maxine and Gordon elected Maxine to replace Mark as President of the company and demoted him to Secretary/Treasurer. Maxine secretly used corporate funds to hire a lawyer to investigate Mark's past actions as President. Maxine and Gordon reduced Mark's salary. Maxine called a board meeting and brought her attorney, who attempted to interrogate Mark after his own attorney had been expelled from the meeting. Gordon and Mark had a physical altercation over managerial authority, and Maxine refused to address the incident. Maxine directed Haag Trucking to stop paying rent to Mark, the owner of the real estate upon which Haag Trucking sits.
However, there is evidence in the record that tends to show that Maxine did not freeze Mark out of Haag Trucking. First, Mark was not voted or forced out of his position as Secretary/Treasurer of Haag Trucking by Maxine and Gordon. Instead, he resigned. Mark voted to elect Gordon as a co-director with him and Maxine, so Gordon and Maxine did not dilute Mark's voting power. Maxine did reduce Mark's salary, but she reduced it from $78,000 per year to the amount Mark had received before Robert died, making Maxine's, Gordon's, and Mark's salaries an equal $52,000 per year. Maxine testified that cash was scarce, so the court could find that Maxine had a legitimate business purpose for reducing Mark's salary. Although Maxine did bring in an attorney to sue Mark, we do not know from the record how much of the company's funds were used to pay the attorney and whether this action reduced Mark's claim on the corporate assets to relative insignificance.
In this case, although there is evidence tending to show that Mark was frozen out of Haag Trucking, the business he had built with his father for thirty years, there is also evidence pointing to the contrary conclusion. See Wenzel v. Hopper & Galliher, P.C., 779 N.E.2d 30, 46 (Ind.Ct.App. 2002) ("For every action that Wenzel testified about and characterized as breach of a fiduciary duty or illegal freeze out, Hopper and Galliher countered with their own testimony and characterization of the action as honest and done in good faith."), trans. denied. Accordingly, we cannot say that the evidence points unerringly to a conclusion different from that reached by the trial court. Thus, we affirm the trial court's conclusion that Mark was not frozen out of Haag Trucking.
Affirmed.
KIRSCH, J., and CRONE, J., concur.
NOTES
[1] Having determined that the trial court's conclusion that Maxine is personally liable is not clearly erroneous, we need not address the parties' arguments as to whether Maxine is liable for tortious interference with Perfect Pallets' contractual relationships, tortious interference with Perfect Pallets' business relationships, or tortious interference with Perfect Pallets' prospective advantage.
[2] At one point in its judgment, the trial court stated that "Mark Haag is entitled to an order requiring Maxine Haag to purchase his minority interest in Haag Trucking, Inc. at a fair price, as a remedy for the freeze-out of his minority interest in Haag Trucking." Appellant's App. p. 27. Neither party mentions this statement in its brief. However, the trial court later stated that "[t]he court finds that the evidence is in conflict as to whether Maxine's conduct was such that it rose to a breach of her fiduciary duty by engaging in a pattern of oppressive conduct that ultimately forced Mark out of Haag Trucking. Under these circumstances, the Court has decline[d] to exercise its discretion to order the majority shareholder to purchase Mark's minority interest for fair value[.]" Id. at 60. In the Judgment section, the trial court stated that the court entered judgment "in favor of Maxine Haag and against Mark Haag on his freeze-out claim." Id. at 63. Accordingly, we follow the parties' presumption that the trial court did in fact find for Maxine and against Mark on the freeze-out claim.