## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 29 2019, 5:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Duran L. Keller
Keller Law
Lafayette, Indiana

ATTORNEY FOR APPELLEE

Thomas F. Little
Power, Little, Little, & Little Law Firm
Frankfort, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| James R. Cadwallader, IV, *Appellant-Petitioner,* <br><br> v. <br><br> James R. Cadwallader, III, *Appellee-Respondent.* | March 29, 2019 <br><br> Court of Appeals Case No. 79A02-1711-MF-2614 <br><br> Appeal from the Tippecanoe Circuit Court <br><br> The Honorable Thomas H. Busch, Judge <br><br> Trial Court Cause No. 79C01-1410-MF-199 |

**Pyle, Judge.**

# Statement of the Case

[1] This case involves an action to enforce a promissory note ("the Note") and a mortgage ("the Mortgage") executed by James R. Cadwallader IV ("Son") in favor of his father, James R. Cadwallader III ("Father"). Son signed the Note in which he agreed to repay Father the $130,000.00 that Father had loaned him, and Son mortgaged his property at issue ("the Mortgaged Property") to Father to secure payment of the note. Son failed to make any payments on the note, and Father filed a complaint to foreclosure on the mortgage. Following a bench trial, the trial court entered an order of foreclosure and judgment in favor of Father. The crux of Son's argument on appeal is that the trial court erred by entering the order of foreclosure in favor of Father. Concluding that there was no error, we affirm the trial court's judgment.

[2] We affirm.

# Issue

Son raises multiple issues, which we consolidate and restate as:
Whether the trial court erred by entering an order of foreclosure in favor of Father.

# Facts[1]

In July 2007, Son, who lived in Indiana, purchased the Mortgaged Property, which was located at 2409 U.S. 231 in Lafayette. Son initially used the Mortgaged Property for his own business, which was a used car lot and car repair shop. Son later rented the property out to a tenant to use as a car lot.

In August 2007, Son sought to purchase a property from a sheriff's sale ("the Tax Sale Property"), which was located at 119 State Road 25 West in Lafayette. Son's mother, grandmother, and aunt collectively loaned $72,000.00 to Son to purchase this property.[2] The money obtained from Son's mother, grandmother, and aunt were secured by a promissory note. Father, who lived in Pennsylvania, contributed $130,000.00 to the purchase of the Tax Sale Property. Father loaned the money to Son and expected that Son would pay him back. On August 7, 2007, Son and Father purchased the Tax Sale Property for approximately $202,000.00. Both Son's and Father's names were listed on the deed to the Tax Sale Property. They considered the purchase of this

---

[1] We remind Son's counsel that an Appellant's statement of facts "shall be in a narrative form and shall not be a witness by witness summary of the testimony." Ind. Appellate Rule 46(A)(6)(c). Additionally, we note that Son reproduced a copy of the bench trial transcript and included it in his Appellant's Appendix. Aside from this reproduction being "a waste of paper and unnecessarily bloating the record on appeal," *see Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 172 (Ind. Ct. App. 2007), it also violates Appellate Rule 50(F), which explicitly instructs that "parties should not reproduce any portion of the Transcript in the Appendix" because the Transcript is transmitted to our Court pursuant to Appellate Rule 12(B).

[2] Son's mother and grandmother each loaned Son $11,000.00, and his aunt loaned him $50,000.00.

property as a partnership venture. They did not create a formal business entity, nor did they have a written contract defining the partnership relationship.

[5] Thereafter, in July 2008, Father and Son obtained a mortgage on the Tax Sale Property from Lafayette Bank and Trust ("the Bank") for $220,000.00. Son then paid back his mother, grandmother, and aunt the money that they had loaned him. Father and Son agreed that Son would find a tenant to rent the Tax Sale Property, that Son would manage the property, and that the mortgage to the Bank would be paid from the rental income. Son got a tenant[3] for the Tax Sale Property, and he paid the mortgage with funds from the rental.

[6] In November 2009, Son and Father went to an attorney, asking him to draft a note and mortgage on the Mortgaged Property with Father as the lender and Son as the borrower. On December 10, 2009, Son signed the Note and Mortgage, which provided as follows:

---

[3] The tenant used the Tax Sale Property as a used car lot.

# NOTE

December _10_, 2009

2409 US 231 S

Lafayette IN 47905

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $130,000.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is James R. Cadwallader, III. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 4.0 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay interest only by making payments every year.

I will make my annual payments once each year beginning on December _10_, 2011, two years after this document is executed. I will make these payments every year until I have paid all of the interest and any other charges described below that I may owe under this Note. My annual payments will be applied to interest before principal. If, on December _10_, 2020, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date." Or if I sell the property referred to above before the maturity date, the entire unpaid balance shall be immediately due and payable to the Lender.

I will make payments at 60 N. Clinton St. Doylestown, PA 18901 or at a different place if required by the Note Holder.

### (B) Amount of Annual Payments

My annual payment will be in the amount of U.S. $5,200.00 (interest only).

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due date or in the amount of my annual payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial payment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any annual payment by the end of N/A calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be N/A. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each annual payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person if fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payments in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise if prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed, within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____
James R. Cadwallader, IV          Borrower

**REAL ESTATE MORTGAGE**

THIS INDENTURE WITNESSETH, that James R. Cadwallader, a/k/a James R. Cadwallader, IV, of Tippecanoe County, in the State of Indiana, Mortgages and Warrants to James R. Cadwallader, III, of Bucks County, in the State of Pennsylvania, the following described real estate in Tippecanoe County, in the State of Indiana, to-wit:

> A part of Out Lots fourteen (14) and fifteen (15) of Patton's Addition of Outlots to the City of Lafayette, Indiana, more completely described as follows: Beginning at a point in the center line of Indiana State Road 43; said point being 62.86 feet East and 47 feet North of the southwest corner of Outlot #15 of Patton's Addition of Outlots to the City of Lafayette, Indiana; thence North 72 degrees East on the center line of State Road 43 for a distance of 322.3 feet; thence southerly for a distance of 128 feet; thence South 72 degrees West parallel to the northern line of the tract for a distance of 322.3 feet; thence northerly parallel to the east line of the tract for a distance of 128 feet to the place of beginning. Said tract of land contains .90 acres, more or less.

This mortgage is given to secure the performance of the provisions hereof and the payment of a certain Promissory Note dated December _10_, 2009, in the principal amount of One Hundred Thirty Thousand and 00/100 Dollars ($130,000.00). The full debt, if not paid earlier, shall be due and payable on December _10_, 2020.

The mortgagor expressly agree to pay the sum of money above secured without relief from valuation or appraisement laws; and upon failure to pay said note, or any part thereof, at maturity, or the interest thereon, or any part thereof, when due, or the taxes or insurance as hereinafter stipulated, thence said note is to be due and collectible, and this mortgage may be foreclosed accordingly. And it is further expressly agreed, that until said note is paid, said mortgagor will keep all legal taxes and charges against said premises paid as they become due, and will keep the buildings thereon insured for the benefit of the mortgagee, as their interest may appear and the policy duly assigned to the mortgagee, and failing to do so, said mortgagee may pay said taxes or insurance, and the amount so paid shall be a part of the debt secured by this mortgage.

IN WITNESS WHEREOF, James R. Cadwallader, a/k/a James R. Cadwallader, IV has hereunto set his hand and seal this _10_ day of December, 2009.

_____
James R. Cadwallader

(Ex. Vol. at 7-8, 10). Thus, pursuant to the Note, Son agreed to pay Father $130,000.00 for a loan of the same amount, and he secured it by granting Father a mortgage on the Mortgaged Property. The parties recorded the Mortgage with the county recorder.

[7] In the summer of 2011, the tenant on the Tax Sale Property left, and Son was unable to find another tenant. Son got behind in the mortgage payments to the

Bank. In September 2011, the Bank filed a complaint for foreclosure on the mortgage for the Tax Sale Property. The Tax Sale Property was sold sometime thereafter in a private sale.[4] Father paid the remaining deficiency to the Bank, and the foreclosure proceeding on the Tax Sale Property was dismissed in 2013.

[8]     In December 2011, Son failed to make an annual payment on the Note for the Mortgaged Property. He also failed to make an annual payment in December 2012. Around that same time, Father and Son had a falling out and, thereafter, they had "[m]inimal" communication. (Tr. Vol. 2 at 143). In 2013, Father went to Lafayette to see Son, but Son would not talk to him. Son again failed to make an annual payment on the Note for the Mortgaged Property in December 2013.

[9]     In October 2014, Father filed a complaint to foreclose on the Note and the Mortgage on the Mortgaged Property.[5] Father alleged that Son had defaulted on the Note and Mortgage on the Mortgaged Property by failing to make any payments as required. Father sought a judgment ordering the sheriff to sell the Mortgaged Property to obtain the "outstanding unpaid principal balance" plus interest and expenses, and he sought "all other relief just and proper in the premises." (App. Vol. 2 at 19).

---

[4] The parties could not recall the date the Tax Sale Property was sold.

[5] Father later filed two amended complaints.

On July 27, 2017, the trial court held a bench trial. Father and Son both testified and submitted exhibits. Father contended that the Note and Mortgage were an enforceable contract to repay Father $130,000.00 and that Son had signed these documents but failed to make the required payments as set out in the Note. Father testified that he and Son had the Note and Mortgage drawn up to secure his $130,000.00 loan to Son and to help protect Son from any potential lawsuits against the Mortgaged Property.

Son acknowledged that he had signed the Note and Mortgage, but he claimed that they were a "sham." (Tr. Vol. 2 at 129). Son's main defense was that the Note and Mortgage were "never intended to be enforced." (Tr. Vol. 2 at 129). Son also argued that the Note and Mortgage were not valid because there was no consideration. In the alternative, Son argued that, even if the Note and Mortgage were valid, Father had failed to provide Son with notice of acceleration as set forth in the Note. The trial court noted that Son's argument about the lack of notice of acceleration was somewhat contrary to his main assertion that the Note and Mortgage were never meant to be enforced. The trial court pointed out that the remedy for that argument would be to enforce the Note and Mortgage and for Son to bring his mortgage payments up to date.

Son also argued that Father was not entitled to any payment from Son because they had been involved in a partnership for the Tax Sale Property. Son suggested that Father's $130,000.00 was a loss that he would have to sustain as part of the partnership that had ended with the sale of the Tax Sale Property. When cross-examining Father, Son's counsel extensively questioned Father to

establish that Father and Son had purchased the Tax Sale Property as a partnership venture. Son also testified that he and Father had a partnership for the Tax Sale Property only, and he acknowledged that the partnership had ended with the sale of the Tax Sale Property. The trial court noted that the partnership issue and the winding up of the partnership had not been raised in the pleadings but had been raised during the trial, and it noted that the evidence showed there was no longer an active partnership because the Tax Sale Property had been sold. At the end of the trial, Son's counsel requested to make a closing argument about the existence of a partnership. However, the trial court instructed the parties to submit proposed findings and conclusions that included a discussion of the partnership.

[13] A few days after the trial, Son sought and was granted permission to supplement the record with three exhibits.[6] Thereafter, the parties submitted their proposed findings and conclusions, which included argument on partnership.[7] In addition to the order of foreclosure, Father requested that the

---

[6] The three exhibits consisted of copies of three checks issued by Son and cashed by the respective payees. The first check, dated July 31, 2008, was issued to Father for the amount of $99,999.00. The second check, dated July 17, 2008, was issued to Son's grandmother in the amount of $5,000.00. The third check, dated July 17, 2008, was issued to Son's grandmother in the amount of $6,000.00.

[7] Father contends that Son did not file proposed findings and conclusions and filed a motion to strike the inclusion of Son's proposed findings and conclusion in his Appellant's Appendix. The chronological case summary ("CCS") contains an entry, dated October 2, 2017, that indicates that Son filed an "Objection to Plaintiff, Father's [P]roposed [F]indings [o]f Fact and Conclusions of Law." (App. Vol. 2 at 11). In response to Father's motion to strike, Son provided documentation to show that he had filed and the trial court had accepted his proposed findings and conclusions on October 2, 2017. By an order, issued on the same date as this memorandum decision, we deny Father's motion to strike.

trial court find that the winding up of the partnership had been completed and that the partnership was terminated.

[14] The trial court entered judgment in favor of Father and ordered foreclosure on the mortgage of the Mortgaged Property. The trial court explicitly rejected Son's defenses regarding lack of consideration and notice of acceleration. The trial court concluded that "the consideration for the Note and Mortgage was a clarification of the parties' financial obligations to each other[.]" (App. Vol. 2 at 15). The trial court ruled that Father would be allowed to list the Mortgaged Property at a sheriff's sale "to collect the $130,000.00 principal owing on the Note" and explained that any funds above the $130,000.00 collected at the foreclosure sale would be distributed to Son. (App. Vol. 2 at 16). The trial court also determined that "[t]he winding up of the partnership between [Father] and [Son] [wa]s complete" and ordered that the "partnership is terminated." (App. Vol. 2 at 16). Son now appeals.

# Decision

[15] Son overarching argument is that the trial court erred by entering the order of foreclosure on the Mortgaged Property in favor of Father. Son asserts that: (1) the Mortgage was not supported by consideration; (2) Father failed to provide him with notice of acceleration; and (3) the trial court erred by making a

determination regarding the winding up and termination of the partnership on the Tax Sale Property.[8]

[16]    Before we address Son's arguments, we note that the trial court entered written findings and conclusions pursuant to Trial Rule 52 and that, under such circumstances, our standard of review is well-settled:

> We must first determine whether the evidence supports the findings of fact and then whether the findings support the judgment. We will not reverse the trial court's findings and judgment unless they are clearly erroneous. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences from the evidence to support them. The judgment is clearly erroneous when it is unsupported by the findings of fact and conclusions entered on the findings. In making these determinations, we will neither reweigh the evidence nor judge witness credibility, considering only the evidence favorable to the judgment and all reasonable inferences therefrom.
>
> While we defer substantially to findings of fact, we do not do so for conclusions of law. We apply a de novo standard of review to conclusions of law and owe no deference to the trial court's determination of such questions.

---

[8] Son also argues that the trial court erred by denying his Trial Rule 41(B) motion for involuntary dismissal. Following Father's presentation of evidence, Son moved for "directed verdict[,]" arguing that the Note and Mortgage were "never intended to be enforced" and that there was no consideration for them. (Tr. Vol. 2 at 92, 93). The trial court denied Son' motion. On appeal, Son makes only a general assertion that the trial court erred by denying his motion. Because Son makes no cogent argument showing how the trial court's denial of his Trial Rule 41(B) motion was erroneous, we conclude that he has waived appellate review of the argument. *See* Ind. Appellate Rule 46(A)(8)(a).

*Gates v. Houston*, 897 N.E.2d 532, 534-35 (Ind. Ct. App. 2008) (citation omitted). Where, as here, the trial court sua sponte entered findings and conclusions, we will apply a general judgment standard of review for any issue not covered by the findings, and we will affirm the judgment on any legal theory supported by the evidence. *Jackson v. Luellen Farms, Inc.*, 877 N.E.2d 848, 853 (Ind. Ct. App. 2007). "[U]nless the evidence viewed in a light most favorable to the trial court leads uncontrovertibly to a conclusion opposite to the one reached, we will not reverse the determination of the trial court." *Hansford v. Maplewood Station Bus. Park*, 621 N.E.2d 347, 350 (Ind. Ct. App. 1993) (internal citations omitted), *reh'g denied*.

[17] We now turn to Son's first argument. Son asserts that there was no consideration to support the Mortgage and that the trial court's conclusion that consideration existed was clearly erroneous. He argues that the trial court's conclusion disregarded the law that "[p]ast acts cannot be used for future consideration[.]" (Son's Br. 14).

[18] We recognize that "[a]s a general rule, past consideration that imposed no obligation when it was furnished will not support a subsequent promise." 6 Ind. Law Encyc. Contracts § 19. *See also Jackson*, 877 N.E.2d at 858 (explaining that "[p]ast consideration can generally not support a new obligation or promise"); *Brown v. Addington,* 114 Ind.App. 404, 408, 52 N.E.2d 640, 641 (1944) ("If a person has been benefited in the past by some act or forbearance for which he incurred no legal liability and afterwards, whether from good feeling or interested motives, he makes a promise to the person by whose act or

forbearance he has benefited, and that promise is made on no other consideration than the past benefit, it is gratuitous and cannot be enforced.").

[19] However, in regard to consideration for a mortgage, we have explained as follows:

> A mortgage must be supported by consideration to be enforceable. Any consideration which will sustain a promise to pay will suffice. It is not necessary that the obligee actually give anything of value to the obligor, and sufficient consideration will be found if it is shown that the mortgagee suffered any damage, inconvenience, detriment or loss, or that he extended any forebearance in reliance upon the mortgage. Consideration exists if it is shown that any right, profit, benefit accrued to the mortgagor, or that responsibility was suffered or undertaken by another. *A pre-existing debt or liability is sufficient consideration to support a mortgage given as security, and there need not be a new consideration at the time of making the mortgage.*

*Huntingburg Prod. Credit Ass'n v. Griese*, 456 N.E.2d 448, 451-52 (Ind. Ct. App. 1983) (emphasis added and internal citations omitted).

[20] Son's challenge to the trial court's determination on consideration is premised on his assertion that he never personally owed Father the $130,000.00. Son contends that Father paid the $130,000.00 to the partnership for the Tax Sale Property and that Father was to get repaid that amount only if there were rental proceeds of the Tax Sale Property and not by him individually. At trial, however, the trial court heard and saw the evidence and the witnesses' testimony, including Father's testimony that the $130,000.00 was a loan that Son was expected to repay. Additionally, Son signed the Note, in which he

stated that he had received a "loan" for $130,000.00 and promised to pay it back. (Father's Ex. 3). Because the evidence supports a finding that the $130,000.00 was a pre-existing debt, we conclude that there was sufficient consideration to support the Mortgage. *See Huntingburg Prod. Credit Ass'n*, 456 N.E.2d at 451 (explaining that "[a] pre-existing debt or liability is sufficient consideration to support a mortgage given as security, and there need not be a new consideration at the time of making the mortgage); *see also Jackson*, 877 N.E.2d at 853 (explaining that our Court will affirm the judgment on any legal theory supported by the evidence).

[21] Next, we address Son's argument that the trial court should not have enforced the Note and Mortgage because Father failed to provide him with notice of acceleration as set out in paragraph 6(C) of the Note. When Son raised this argument as a defense at trial, the trial court noted that this argument about the lack of notice of acceleration was somewhat contrary to his main assertion that the Note and Mortgage were never meant to be enforced. In its findings and conclusions, the trial court rejected the notice of acceleration defense, noting that Son had "disclaimed the validity of the Note and Mortgage." (App. Vol. 2 at 15).

[22] To determine whether Father was required to give a notice of acceleration, we must look to the language of the relevant agreements executed by the parties. *See Otto v. Park Garden Associates*, 612 N.E.2d 135, 138 (Ind. Ct. App. 1993), *reh'g denied*, *trans. denied*. When construing contracts, we will read them as a whole and will construe the language therein so as not to render any words,

phrases, or terms ineffective or meaningless. *State Farm Fire & Cas. Co. v. Riddell Nat. Bank*, 984 N.E.2d 655, 658 (Ind. Ct. App. 2013), *trans. denied*. Additionally, unambiguous provisions will be given their plain and ordinary meaning and will be conclusive upon the parties and upon the courts. *Id.* at 567.

[23] Here, Son signed the Note and Mortgage on the same day, December 10, 2009, and promised to pay Father $130,000.00 for a loan of the same amount. Paragraph 6(B) of the Note provided that Son would be "in default" if he "d[id] not pay the full amount of each annual payment on the date it [wa]s due[.]" (Father's Ex. 3). The Note further provided as follows:

### 6. BORROWER'S FAILURE TO PAY AS REQUIRED

* * * * *

### (C) Notice of Default

If I am in default, the Note Holder <u>may</u> send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder <u>may</u> require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

* * * * *

### 9. WAIVERS

I . . . waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of

dishonor" means the right to require the Note Holder to give notice to other person that amounts due have not been paid.

(Father's Ex. 3) (emphasis added). The Mortgage, signed the same day as the Note, provides, in relevant part, as follows:

> This mortgage is given to secure the performance of the provisions hereof and the payment of a certain Promissory Note dated December 10, 2009, in the principal amount of One Hundred Thirty Thousand and 00/100 Dollars ($130,000.00). The full debit if not paid earlier, shall be due and payable on December 10, 2020.
>
> The mortgagor expressly agree[s] to pay the sum of money above without relief from valuation or appraisement laws; and upon the failure to pay said note, or any part thereof, at maturity, or the interest thereon, or any part thereof, when due, . . . thence said note is to be due and collectible, and this mortgage may be foreclosed accordingly.

(Father's Ex. 4) (emphasis added).

[24] The language used in paragraph 6(C) of the Note provides that, upon default by Son, Father "may" send Son a written notice telling him to pay the overdue amount. The use of the language "may" is permissive and not mandatory. *See Stump v. St. Joseph Cty. Treasurer*, 33 N.E.3d 360, 365 (Ind. Ct. App. 2015). The note also has a provision in which Son waived his right of presentment, thereby waiving his right to have Father demand payment. Additionally, the Mortgage provides that the "note is due and collectible" and the "mortgage may be foreclosed" upon Son's failure to pay "any part" of the Note when due. (Father's Ex. 4). Base on the clear language in these documents, Father was

not required to give Son notice of acceleration. *See, e.g.*, *Otto*, 612 N.E.2d at 139 (Ind. Ct. App. 1993) (holding that the language of the note and mortgage, including a waiver of presentment, showed that the mortgagee did not have an obligation to give a notice of acceleration to the mortgagor). Because the evidence viewed in a light most favorable to the trial court does not lead uncontrovertibly to a conclusion opposite to the one reached, we affirm the trial court's judgment for foreclosure in favor of Father. *See Hansford*, 621 N.E.2d at 350 (explaining that "unless the evidence viewed in a light most favorable to the trial court leads uncontrovertibly to a conclusion opposite to the one reached, we will not reverse the determination of the trial court").

[25] Lastly, we turn to Son's argument that the trial court erred by making a determination regarding the winding up and termination of the partnership on the Tax Sale Property. He contends that the partnership issue "was not properly before the [trial] [c]ourt" because Father did not seek a dissolution of the partnership issue in his complaint. (Son's Br. 22). Son does not argue that the substance of the trial court's determination is erroneous, nor does he contend that the partnership is still intact. Instead, he focuses on the procedural nature of notice pleading and asserts that the trial court should have refrained from making any determination regarding the partnership issue because "the partnership was not properly at issue[.]" (Son's Br. 25). We will not address Son's argument because he invited any alleged error. Under the doctrine of invited error, "'a party may not take advantage of an error that []he commits, invites, or which is the natural consequence of h[is] own neglect or

misconduct.'" *Witte v. Mundy ex rel. Mundy*, 820 N.E.2d 128, 133 (Ind. 2005) (quoting *Evans v. Evans,* 766 N.E.2d 1240, 1245 (Ind. Ct. App. 2002). As noted in the facts above, Son raised the partnership issue during trial and precipitated the trial court's determination on the issue. Because Son created the situation of which he now complains, he cannot now argue that the trial court's determination was procedurally erroneous. *See id.* at 134.[9]

[26] Affirmed.

Vaidik, C.J., and Barnes, Sr. J., concur.

---

[9] Moreover, under the Uniform Partnership Act, a trial court may dissolve a partnership by decree when "[a] partner . . . otherwise acts in matters relating to the partnership business so that it is not reasonably practicable to carry on the business in partnership with that partner" or when "[o]ther circumstances render a dissolution equitable." IND. CODE §§ 23-4-1-32(1)(d) and (f).